Case Numbers 15-1072 and 15-1073 National Biodiesel Board Petitioner v. Environmental Protection Agency Mr. Killian for the petitioner, Ms. Rosen for the respondent Good morning, your honors. May it please the court. There's a central problem that links together a lot of the arguments that the parties have briefed in this case, and that's where I'd like to start. EPA has used its consortium regulations to do something that is broader and fundamentally different than what those regulations were designed to do. For instead of shifting the record-keeping requirement that it imposes on individual RIN generators, shifting that to a third party, EPA has fundamentally created a brand new requirement that has replaced the record-keeping requirement that applies to everyone else. When Congress adopted the Energy Independence Security Act of 2007, it defined the term renewable biomass as feedstock that comes from land that was cultivated before December 2007. In an EPA's initial round of regulations in 2009 and 2010, EPA determined that it is necessary, and that's EPA's word, necessary, that RIN generators collect and maintain two types of documents to substantiate this. First, they need to collect historical records that show that a particular farm was operating in 2007 and that the land was cultivated at that point. And then second, in the present day, RIN generators have to collect transfer documents that show that individual feedstock actually came from that farm, was segregated through the supply chain, and then actually turned into biofuel. What EPA did is it provided two ways to comply with this record-keeping requirement. So this is your argument that the regulations themselves are invalid, right? No, Your Honor. I'm trying to set up the point that this is a rule and that what EPA did here in this instance is a rule that fundamentally breaks from the written rule that it created several years ago. So is this part of your argument that this particular plan violates the regulation? Well, I do think, Your Honor, the reason I said it at the outset, this fundamental point that EPA has broken with the reg ties together a lot of our arguments, both that there should have been notice and comment because the action here was a rule, both that the action violates the rule because the regulation itself is quite limited and EPA has expanded that, and to the extent any of this is actually authorized by the 2010 reg, then we have a new grounds arising after challenge to that. Can I ask, speaking just for myself, assume you have standing, assume I don't agree with you, and I'm not saying where I am, but just assume for this question, I don't agree with you on the notice and comment argument, and assume a challenge to the rule is not before me at the moment. Just assume all that. Under that, you're arguing that what they did is contrary to the rule. Correct. Okay? Explain that. Sure. Thank you, Judge Kavanaugh. What the rule itself does, it provides a mechanism for a third party to collect and maintain records in place of the individuals. You can sort of understand the economics behind this. Instead of having 100 RIN generators reach out to 1,000 different farmers and collect the historical data that shows that their farms were cultivated and operating in December 2007, the group of RIN generators can get together and hire one third party to sort of be the middleman and cut down the amount of paperwork that is actually going to be collected, and that third party, under the consortium approach, it gets approval from EPA to take the record-keeping obligation away from the individuals. But here it is undisputed, and if I could leave the Court with sort of one of the most fundamental points of our case, it is undisputed that CARBEO members cannot satisfy the individual record-keeping requirement. It's on page 905 through 907 of the Joint Appendix. It is in the CARBEO application itself. EPA posed a question to CARBEO when the initial application came in and said, how is this proposal you have going to satisfy the record-keeping requirement for finding historical data? CARBEO said, we can't do that because documents don't exist in Argentina, and because to the extent they do, we do not have the legal or practical ability to request those documents. So that's when CARBEO proposed this new satellite methodology. And to us, that's sort of the fundamental break with the consortium approach. What CARBEO has said is instead of collecting documents from the farmers that show that their farms were operating in 2007, we're going to use satellite data historically and try to drill down to individual tracts of land and determine whether or not there's an arbitrary and capricious argument. I think it's also contrary to the text of the regulation. Okay, so assume – I'm not saying where I am, but assume I'm not with you on that arbitrary and capricious argument for this, that that's just a different way of getting there. What text of what regulation do you think is violated? Sure. This is 40 CFR 80.1454H. H3 requires that the survey program and H3II obtain the records and product transfer documents associated with the feedstocks being audited. Those records are the historical records that are referred to throughout the regulation that show that the farm was operating in 2007. Specifically, under 1454C1, these are the records that show that the farm was operating. There are various types of contemporaneous records that EPA requires. Instead of ex post affidavits from farmers that say, yeah, sure, I was operating all those years ago, the requirement in the regs is that the farmers or the feedstock suppliers themselves actually have historical records that show they were operating at the time. You're going to have to go real slow for me on this. Okay, you're on. C1, is that where you are? C1 is the individual compliance. I can start there. That applies to a producer or an importer. Correct, and we're dealing with producers here in Argentina. C1IIB. IIB, got it. The records must be provided by the feedstock producer traceable to the land in question and consist of, and then it says one, sales records, et cetera, two, a written management plan for agricultural, silvicultural purposes, three, documentation of land management, and four, evidence of the existence of a road system. These are all contemporaneous records as of sort of dated December 2007 or thereabouts to show that a farm was, in fact, operating at that point. And what the consortium approach, which Judge Kavanaugh is subsection H, so subsection C here is the individual compliance approach, what our brief calls map and track, but individual compliance is really what it's driving at. What subsection H is is the consortium approach. Right, so that's the alternative. Correct. Just to be clear, if they comply with the alternative, then everything you just said about C doesn't matter, correct? Yes, but our argument, Judge Kavanaugh, is that the alternative is fundamentally about shifting the obligation from the individuals to a single third party to reduce cost, not in that shifting to actually change the obligation. And that's where we think EPA went awry with the CARBEO proposal. Because of the use of satellites? Correct. CARBEO concedes But is there any language in the alternative portion of the regulation that that would violate? Yeah, I believe so, Your Honor. What would that be? First off, satellites are not expressly allowed under H. I understand that. And nor were they envisioned But I ask you whether there's any language that would Yes, Your Honor. So as I was explaining to Judge Kavanaugh, I think H3II and H3IV are the two I'll drill down on. What do they say? H3? H3II, obtain the records and product transfer documents associated with the feedstocks being audited in H3VII. Confirm that feedstocks used to produce RIN-generating renewable fuels meet the definition of renewable biomass as defined. And is your position that the satellites are not authorized by the regulation or that they aren't adequate to meet this requirement? I think our position is somewhat between those two, Judge Tatel, in that it's untested. We just don't know whether satellites can be used in this way. EPA has been cautious in the use of satellite data in other circumstances. In particular, I point the court to 80.1457, which is the aggregate compliance approach, the third way that EPA has provided to comply with the renewable biomass definition. And in that approach, EPA expressly allows for the use of satellite data. I'm just wondering, what I'm wondering about is, okay, assume I sort of have the same suspicion you do about this. How can this court, I mean, how can we second guess the agency's judgment about the use of satellites? I mean, it's done a huge amount of study. It's got a 20-page document in here explaining the technology and how it will work. I mean, how would we say that that's inadequate? And second, isn't it possible, suppose we were, and again, same caveat, Judge Kavanaugh. I'm not saying what I think, but suppose we were to think that this was okay. And five years from now, or three years from now, it was clear that the satellite data was in fact inadequate and it wasn't detecting the increase in agricultural land. You could challenge it then, right? Well, I would hope we'd be able to challenge it at that point, Your Honor. But to your first question, fundamentally. We're not locking this in at this point. Well, I do question how we're going to be able to determine the inadequacy of the satellite approach, given the way that this procedure has played out. There's no sort of ongoing public notice and comment like there is under the aggregate compliance approach, or I was pointing to the Court a moment ago. Under Section 1457, EPA has created a procedure that for an entire country, if they want to opt out of the record-keeping requirement and use satellite data to show decreasing amount of crop lands, that procedure exists. It requires notice and comment, and I'll put an asterisk on that because I think it's very important to explain why notice and comment is necessary under the aggregate approach, but it also requires annual renewals of that that are also subject to notice and comment so that the public can continually monitor the success or not of satellite data. Judge Tatel, to your question on satellite data, I don't want to impute it and say that it is per se impermissible in this context. It is untested. Satellite data has been used only to demonstrate that in an aggregate sort of big-picture sense, the amount of crop land in a country is going down. There are errors, as we believe, in sort of that there are error rates, and in a big-picture analysis, those errors tend to cancel out. What's never been done before, never been tested, is the use of satellites to drill down to particular plots of land historically and say, yes, this was a farm, or no, this was a tree. Suppose it could do that. Suppose. I know you disagree. I don't want to disagree. I just think it's an open question, Judge. Right. Got it. Suppose it could do that. Would there be a violation of the reg? As written, yes. Because we believe the reg requires that the records, and those are the records that are referred to in C1 that I read to your Honor earlier, the maps and the historical records, actually be obtained by this third party. And I'll point the Court again to page 905 of the Joint Appendix. EPA itself posed this question to CARBEO during the application process. The question says, please demonstrate. It says, we think your waybill method is going to be adequate, but please demonstrate how you're going to collect the records that are required under C1. And CARBEO says, we can't. And that's why we're proposing the satellite method. And in our view, Your Honors, that's what turns this into a rule that requires notice and comment rulemaking. As the APA says, if an agency wants to amend or repeal a rule, then it needs to engage in a rulemaking. And I think there are four reasons I'd like to tell the Court why this is much more a rule than a license or an order as the agency has contended. As I've been trying to explain, we think that this is a fairly sharp break from the very narrow purpose that EPA created for this consortium approach. Instead of simply shifting the burden, EPA has fundamentally changed the burden and created a brand-new method of compliance that has never been tested. Not even in the advance notice of proposed rulemaking in 2009 was something like this suggested. So to now squeeze it through the consortium approach, we think, is a fundamental break with the rule that requires rulemaking. Second, this is purely prospective. And under the APA's definition of a rule, something with future effect is a definition of a rule. And in this Court's decision in the National Association of Homebuilders case, which we cite in our reply brief, the Court was posed, excuse me, confronting a question whether a nationwide permit under the Clean Water Act was a rule. The Army Corps of Engineers argued that it was a license. This Court rejected that and said, no, it's a rule because it's prospective and it applies to the entire country of the United States. Well, that leads to my third point. This is a rule because of its scope. Carbio represents 95% of the biodiesel production capacity in Argentina right now. And this rule has effects not only for those members, but also for the feedstock distributors who aren't members, for the feedstock suppliers and farmers who are further down. This could not be a more national rule that allows every production biodiesel producer in Argentina to generate RINs without maintaining the records that are required of everyone else. And finally, the last reason why this is more a rule than an order is that it leaves substantial issues open for further resolution. An adjudication. Yeah. I finished your sentence. I want to change the subject. Okay. An adjudication resolves on discrete facts and comes to resolution on issues. Here, EPA has not decided what the go zones are, what the no-go zones are, or what even the methodology will be for that. That is all to be decided later on. And that sort of lack of resolution on core issues is indicative of a rule and not an order. So I want to ask you just two quick questions about your other argument that this plan is deficient because it doesn't include importers? Yes, Your Honor. So, number one, isn't it true that importers that are not covered by this plan are bound by the individual reporting requirements of C-1? To the extent that they are generating RINs themselves. That's correct. Okay. But they would not be generating RINs themselves if the RINs are generated by the producers. It's an either-or situation. Right. But the fact that importers aren't covered doesn't create some sort of gap. I disagree with that, I think, for this reason. It is critical to – may I continue answering your question, Your Honor? Please. It's critical to Congress's definition of renewable biomass. Not only that the feedstock come from land that was cultivated in December 2007, but that that feedstock remains segregated from non-qualifying feedstock, and that after turned into renewable fuel, that renewable fuel remains segregated. And when importers are left out of the audits and surveys, as they are on a cargo proposal, there's no guarantee that the segregation is going to continue after the biofuel leaves the production facility in Argentina and then comes to the importers in the United States. Whereas in the individual record-keeping – But the individual tracking, I mean, they're required to – they have to retain data. They do. Indicating the land where it came from. And that's what they don't have to retain anymore. They have to have all the bills of lading. In other words, they have to have a complete paper trail. And that's what they don't have to have under the CARB-EO approach. No, I agree. The individual producers are relieved. No, but that wasn't my question. I agree with you, Beth, that they don't need that paper trail under the CARB-EO proposal. Correct. But an importer that's not covered by the CARB-EO proposal will have to have that paper trail. Correct. It won't be able to get it. Only to the – the importer needs the paper trail if he or she is generating the RINs. Well, those are the only ones. So let's talk about importers who aren't generating the RINs. They need to know, should I segregate this fuel or can I mix it with other fuel? They can't have – there is no documentation they can request from the RIN producer to tell them whether to segregate or not because that documentation is no longer being kept. CARB-EO isn't getting it. Robertson Control Union isn't getting it. And the individuals aren't getting it. And that's why it's important to audit those importers. Right. So EPA also says – and they're responding to your argument that it doesn't include importers. One of their other – one of the agency's other arguments is that if you look at the whole regulation, that the reason its importers are not included here – don't have to be – is because of the possibility that the United States might someday no longer be an aggregate producer, in which case it would – it could develop a plan under this alternative and there wouldn't be any importers. I don't think I follow that argument, Your Honor. If the United States loses its aggregate compliance approach, we'll still have domestic biofuel producers. But there's no importers. That's why there wouldn't be an importer in the plan. There would only be producers. Well, there will always – the possibility, I believe, I understand, of importers, to the extent that we have fuel coming from Canada or Argentina. No, no, no. It's fuel produced in the United States. Correct. The United States is now – I take Your Honor's point. I understand. Yeah, I just got it out of the EPA. Yeah, and I think – I understand that. I understand that argument now. And I think my answer to that is it may be a null set when there is an aggregate approach that is applied to a domestic consortium, a null set in the sense of they don't need to survey importers because there's no importers in the supply chain. But EPA could not have been clearer in its reg when it required visits and audits, not just of the production facilities, but it says and the import facilities. Well, but elsewhere in the regulation it says importers or. Yeah, it may seem. But only to the extent it's RIN-generating, and I guess that's a difference. The RIN-generating, it's either RIN-generating producers or RIN-generating importers may apply for the consortium approach. But once either of them does, then you have to visit the facilities of both the importers, whether or not they're RIN-generating. That's the and. The and has been changed to or, is your argument. And EPA concedes that, and it's brief. Yeah, they claim that they have discretion. That's H2O2, right? Yes, and it's also in H3, Your Honor. H3I. Wait a minute. Hold on a minute. In double I, that one's a problem. They've changed that and to an or. But in triple I, it says representative of all renewable fuel producers and importers in the survey area. And if that were the United States, there wouldn't be any importers in the survey area. I agree, Your Honor. So the only problem, I just want to identify what the issue is here. The only word problem here seems to be in double I, correct? They have changed that to or. Yes, and they've changed it in two double I and in three I. There's also the same conduct feedstock audits of renewable fuel production and import facilities is in three I as well. There's two ands they've turned to an or. And the practical effect, so I understand this, of changing the ands to the or is? Is that in this instance, importers will not be surveyed to determine whether or not they're accurately and correctly segregating the fuel that they receive from Argentina. The biodiesel, and they won't themselves be able to request documentation from the producers to say, hey, show me that this actually came from qualifying feedstock and came from qualifying lands, because that documentation doesn't exist. And they won't be able to get it from the individual producers. They won't be able to get it from Robertson Control Union. They won't be able to get it from Carbio. So in the individual compliance mechanism, they always have that ability to check for themselves, and now that disappears with just a reliance on the satellite data. So we think that the audit is a critical component of assuring quality, that the fuel coming into the United States does in fact meet Congress's definition of renewable biodiesel. Okay. Thank you. Thank you, Your Honors. Okay. Good morning. Perry Rosen from the Department of Justice. With me is Sue Staley from EPA. We certainly and strongly believe that the petitioner has no standing in this case. Well, assuming you don't agree with you, well, at least speaking for myself. Speaking for me, too. I'm sorry? Does Judge Brown have a question about that? No. Okay. Why don't you go on to something else? Okay. Okay. Addressing the issues that Mr. Killian raised, these are simply alternative paperwork record-keeping requirements. There's no requirement that one has to match the other. The requirement, what it says- Well, it has to be as effective. It has to be as effective. Yeah. Let's go through, and Mr. Killian is right. There are different documents that are kept in Argentina than there are in the United States. So the list of certain documents needs to be looked at a bit differently, and that's what happened in this CARB-O application process. So here's what's required. If you compare individual tracking and the CARB-O group tracking and whether the CARB-O group tracking satisfies the same quality assurance, in the group tracking it has to be an independent audit of feedstocks. There's no audit done in individual tracking by any third party. The auditor has to be approved by the EPA. There's no auditor to approve an individual tracking. EPA must approve the whole survey process and how it works. No such requirement in individual tracking. It requires satellite imagery showing forested areas that show ground cover. There's no such requirement. The council's argument is that the satellite imagery can't substitute for the detailed document trail, which doesn't exist in Argentina. And there's no basis for that. The only thing that's required in individual tracking is a map showing the outline of the farmland. The satellite tracking, which includes down to the level of showing ground covers, you can actually look at these satellite pictures. This is a technical process with experts used. We use it in our wetlands cases, for instance, to determine whether there were wetlands before they were destroyed. You can analyze these satellite images, which is a very costly process that they're going through here, to determine different ground covers. You can look at a picture and say, hey, this is forest. They say it's not tested yet. It's too uncertain for you to be able to rely on this to comply with it. As is set forth in the CARBEO application, as EPA confirms, it's used in courts throughout this country and throughout the world, satellite imagery. EPA has satellite imagery experts. I trust it's used, but is it used for this purpose? Does it have the kind of refinement? I don't think anyone has used this group tracking process, including, by the way, CARBEO itself has not used this process. Well, that's his point. But the analysis, EPA analyzed the 20-page report as set forth and looked at that set, and its determination was this was a reasonable way to do that, combined with the other documentation they provide, such as the waybills, which show the transportation of the feedstock. There are site visits that are required in the CARBEO approval to the farm where the feedstock's coming. There's no such requirement in individual tracking. There are quarterly desk audits of the feed suppliers, and the feed suppliers have to submit documents. Let me ask you a question. I'm just trying to think about the way you're analyzing this. Why are you comparing this to the individual tracking? Isn't the question whether or not the plan, the CARBEO plan, satisfies the alternative tracking, alternative method? Isn't that the question here? That is one of the questions. We're assuming for purposes of this argument that their challenge to the regulation itself is too late. So the only question is, is the EPA's approval of the CARBEO plan, does that comply with the alternative method? So I'm just asking, why do you keep comparing it to the individual tracking? Because their main argument about why it didn't comply with the regulation is that it doesn't have the same quality assurance as individual tracking. It's called alternative because it's an alternative, right? That's correct. Okay. And the alternative system must be at least as effective, correct, as individual tracking? Correct. Okay, so maybe I'm missing something here, but it seems to me you would want to tell us, your argument would be that the approval, that the CARBEO plan satisfies the alternative method. Whatever the alternative method is, it's in the regulation, that the CARBEO plan satisfies that, right? That's correct. Okay. So counsel argues that it doesn't for two reasons. He says, one, EPA has conceded that the kinds of data required under the individual tracking plan are not available and that the satellite technology is untested and can't supply that. That's number one. And number two, they argue that it excludes, it doesn't cover importers. Okay. And both of those go to the question of whether or not the CARBEO plan satisfies the alternative method. The alternative group tracking method. Yeah. So what are your responses? Do you agree that that's the way we should look at this? Yes. Yeah, okay. As to those claims, yes. Okay, so why don't you tell me your response to those two arguments. Okay. As to the importer issue, as the court pointed out, there is some language where it says the producer and importer. But the whole provision, subsection H, talks about applying that subsection H, alternative tracking, group tracking, to any foreign or domestic renewable producer or wind generating importer. It's an either or. It can apply to either one. It says and. That's the problem. And so what we were trying to assess in asking your opposing counsel was, is there a gap if you only have it at one and not the other? And he explained, yeah, there is a gap. If you're not doing it at the import facilities, you're missing various things that could be important to maintain the quality control for the program. So there is a difference when you do or instead of and. And your response to that is? There is no gap. This is just the recordkeeping provision. And it's entirely written to ensure the use of qualified lands upstream, from everybody upstream, from the farmer to the silos to the crusher to the producer to the party that creates the RIN, which in this case is the producer. The point, I think, is that if you're not doing it, and again, correct me if I'm wrong. You know more about the facts. If you're not doing it at the import facilities, there's at least a risk that the program is not being complied with in the way that it's supposed to be complied with. And that's speaking very generally. Okay. Let me just flush that out because that's my question, too. I think what I heard counsel say was that the importer, he agrees that the importer will be covered by the individual tracking, but that the data that the importer collects under the individual tracking program will not assure anyone that, well, will not provide the assurance required by the overall regulation. Well, that's the responsibility of the importer. There are other provisions that deal downstream with all of the parties downstream, including the obligated parties, the refiner who use these fuel. They all have to certify that the biofuel that they're using came from qualified biomass, which in this case includes qualified land. They're all subject to large penalties for not doing that. Now, you're talking about the importer's obligations under individual tracking, right? And under other provisions. All the way through the process, certifications need to be made that under Section 80.1464B15, they have to certify that feedstocks meet the definition of renewable biomass in Section 80.1401, which means it comes from qualified land. There are inspections and audits that are allowed by EPA. There are significant penalties for violating these certifications. They must keep records under 1454B. They have to keep records that show that it came from qualified land. In the regulation, just to go to H2.2, conducted at renewable fuel production and import facilities, presumably EPA wrote that in the regulation because it was important to have the compliance survey conducted at both places, or else there could be a problem. And my question is, I understand why it's essential to have it at the production facility, but isn't it also essential, or at least this regulation would suggest it's also essential to have it at the import facility? If you look at the regulation as a whole, and even this provision as a whole, there's no documents required that would continue this process upstream. There were no comments submitted about how do we do this upstream after it leaves our hands. It leaves the producer's hands and is sold to the importer. The importer then has his own responsibilities under these separate provisions. But the determination in all the paperwork is there to ensure that this came from renewable biomass. Again, I think this is just this use of the word in little I2, little 2, conducted at renewable fuel production and import facility. So is it that it was meant, it's just a mistake. It was meant to be in ore. It should have been in ore because, again, when you start out the provision, it talks about... Why would you ever have it at the import facilities? I guess that's what I'm missing here. In other words, when this regulation was drafted, why didn't it just say conducted at renewable fuel production facilities? The answer to that is because when you're talking about foreign biofuels, either the producer or the importer can be the RIN generator. And in the case of the RIN generator, then those obligations apply to the importer. So that's why, in your point, is when the RIN generator is the producer, it doesn't matter. Everything you need is taken care of. And therefore, you don't invent the ore to put Judge Tatel's... That's exactly right. Okay. And turning back to the requirements of subsection H and why all these are met, they're very general requirements. They set out... Suppose... Several cases... Well, you go ahead. I don't want to interrupt you. Go ahead. Then I'll ask you. The surveys should be conducted by an independent party, which is being done here, an independent third party. They should be representative of the different producers, which is the case here. This is under H2, the annual compliance survey and what's required. And then it requires the surveyor to do certain things, like get documentation from the feedstock producers, from everyone along the chain upstream to the producer, and do audits on a regular basis. Does EPA audit the cardio plan over time? EPA has the ability to audit the plan over time. EPA receives the documentation. Another major difference in showing why this group tracking is at least as good as individual tracking is all this documentation, which, by the way, has to be kept in a database. So all these reports are audited on a quarterly... from feedstock providers that came from this land are audited on a quarterly basis. Those go into larger audits in an electronic database. And then the auditor has to produce a report to EPA every year. None of that happens under individual tracking. No, no, I see. You're now making your argument that this is better than the alternative plan. And my question is, does it comply with the alternative method? So suppose, for example, the reason I ask the question about continuing auditing is everybody agrees that the satellite usage for this purpose is untested. I mean, that doesn't mean it's wrong. It's just nobody ever used it for this. Suppose in a couple of years it becomes clear that there is more additional land beyond what was being used in 07, being used for this in Argentina. What would EPA do about that? And more important, could someone come to EPA and say, this is not succeeding because the satellite data is insufficiently precise and it's not catching the expansion of agricultural land in Argentina? Absolutely. Under subsection H, this group tracking, EPA has the right to void immediately, first of all, any party that doesn't submit the required documentation. That wasn't my question. And B, let's say the satellite tracking doesn't play out. EPA has the right to void this approval immediately if it proves simply ineffective. I understand that, but how would American producers, namely the petitioner here, how would they know? Would they have a way of knowing independently whether the satellite system was not succeeding? Yes. How would they know that? I'm sorry. Because on an annual basis, under the group plan, as opposed to the individual plan, under the group plan, a report has to be submitted to EPA with all of this information. The sole purpose of that report is to establish that each of these participants in the CARBEO plan are using biofuels from qualified land, and that's a public document that's subject to public review. Okay, I don't really push the point. Maybe I just don't understand the technology enough. But how would EPA know whether the satellite imagery is accurately telling us that agricultural land in Argentina that wasn't used in 2007 isn't being used today? Okay. In other words, if the imagery is itself insufficient, how would we know it's insufficient? What other way would we have to? The imagery is not insufficient. That's just a pure allegation here based on nothing other than it hasn't been tested. EPA made the determination, to which, as you know, on a technical issue, they're entitled to a pretty substantial difference. I've written opinions that say that. I got that. That this is more than sufficient, and it's explained in the report in the CARBEO application about how this works. It goes down certain levels. You can literally look at these photographs and see, was this forested or not? And they need new satellite imagery every year. So you go back and check the farmland every year. That's part of the requirement. But it goes down to much further levels than that. You can use this analysis to determine the specific ground cover that was out there. Okay. Thanks. Thank you. I see my time is up. I want to emphasize that this is a record-keeping requirement. There's probably no area where EPA is entitled to more deference than how to apply that. There are no statutory directives here under this statute about how it should apply, record-keeping requirements, or even that there should be a record-keeping requirement. Okay, thank you. Does Mr. Killian have any more time? You can take two minutes, Mr. Killian. Thank you, Your Honors. I'll make two, maybe three points. First, Judge Tatel, in your questioning to Mr. Rosen, I do want to push back a little bit. We believe there are two independent requirements in the regulation that are not being complied with. Your Honor's phrasing of the regulation took all of our arguments and said that they essentially go to the quality assurance requirement. We believe that that is a requirement in Section 1454H, but there is an additional requirement for the records be maintained. The record-keeping requirement under 3II is a separate and distinct requirement from the requirement that the consortium approach achieve the same level of quality as the individual approach. So we think that there are two distinct requirements, and the failure to keep records is not just relevant to quality, but also a technical, but I think important, separate requirement. Your Honor also asked a question about how this can be tested in the future. The truth is we won't know. We don't have access to the foreign lands. EPA doesn't have access to what's going on in Argentina. And that's the whole reason why EPA has allowed notice and comment for aggregate compliance petitions under Section 1457. EPA doesn't have expertise in foreign agriculture or foreign land use. It doesn't have jurisdiction over the foreign land or even the foreign supply chains. And the satellite data question is complicated. It is untested at this point. We think it could potentially be useful, but even when these reports that Mr. Rosen mentioned are filed in a few years, we're not going to have access to those because they're going to be as secret as this process that just happened. So in our view, Your Honors, we think that the approval here was invalid. We would like notice and comment on the ability to use it. What about the and-or, the response on the and-or? So to that, Judge Kavanaugh, we believe that the government is sort of slight of hand a bit here. They're saying when the RINs aren't generated by the importer, I think I'm phrasing that correctly. That's right. Then this regulation might as well be an or. H requires the audit of the entire supply chain from the farmers all the way through the importers, no matter who is generating the RINs. And I would point to the court to the first paragraph of H. It refers to any foreign or domestic renewable fuel producer or RIN-generating importer. That's an important adjective, RIN-generating importer. All the other references in here to importer don't depend on whether or not the importer is generating RINs. All right. Yeah, of course. Yeah, of course. Did you do something else? No, just that we wish to have the decision vacated, Your Honors. All right, great. Mr. Rosen, could you come back up here for a second? I just want to make sure I have your response on the H3 little 2 point, obtaining the records and product transfer documents associated with the feedstock being audited. You know what I'm talking about? So when Mr. Eichelian just got back up, he wanted to emphasize that point, and I don't think we talked about that point. So that's H. So that's 1454 H3 little 2. Right, and it requires the auditor, the surveyor, to obtain those documents. And the CARB-EO plan does that. It requires the auditor to – it requires the feedstock suppliers to submit the documents to the auditor and for the auditor to review those documents. Didn't – well, we can ask Mr. Eichelian this question, but I thought I heard him say that EPA has conceded that those documents don't exist. Is that not true? No. CARB-EO pointed out that the types of documents in the individual tracking process are different types of documents than they keep in Argentina, and that in Argentina they could have different types, a separate set of documents, combined with the satellite imagery, which would effectively do more in establishing the origin. But would it satisfy the language that Judge Kavanaugh just quoted to you? Is that your point? Yes. Yes, those actually exist. They're just not – they're different. Is that your point? They're different, and that's explained throughout the CARB-EO approval and in EPA's response. For instance, they're called these waybills, which show the transportation. They show the exact same thing that the list of potential documents in the individual tracking show. And those documents are available, and in the audit, and in the report sent to EPA. Okay. Mr. Eichelian, what do you think about that? Yes. The intention was correct. I think that's bunk. The waybills, as I mentioned to the Court at the beginning, there are two types of records that need to be kept, the historical records that show contemporaneously was this farm operating in 2007, and the current records that show a transfer from that plot of land to the RIN generator. The waybills that Mr. Rosen is discussing are the current transfer documents, which are mentioned in H3II after the end, records and transfer documents. That's all the waybill shows. The record is the contemporaneous historical record that the farm was operating in 2007. And as CARB-EO says on page 905 and 906, with respect to this, and they walk through all four of the items in C, CARB-EO is not able to explain how any of its records will satisfy the evidentiary requirements of these subsections for the following reasons. And then for two pages concedes that those records just don't exist and says, so we're going to use satellites. Thank you, Your Honor. Thank you. Case is submitted.
judges: Tatel, Brown, Kavanaugh